UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FIREGLASS, a California corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>MODERUSTIC, INC., a California corporation,<br><br>                                    Defendant. | Case No.: 15-CV-2866 JLS (BGS)<br><br>**ORDER: (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(ECF Nos. 122, 123) |

Presently before the Court is Plaintiff American Fireglass' Motion for Summary Judgment of Defendant's infringement and false advertising and unfair business practices claims. ("Pl. MSJ," ECF No. 122). Defendant Moderustic, Inc. filed a Response in Opposition to ("Def. Opp'n," ECF No. 129) and Plaintiff filed a Reply in Support of ("Pl. Reply," ECF No. 131) Plaintiff's Motion.

Also before the Court is Defendant's Motion for Summary Judgment of Plaintiff's false advertising and unfair business practices claims. ("Def. MSJ," ECF No. 123). Plaintiff filed a Response in Opposition to ("Pl. Opp'n," ECF No. 125) and Defendant filed a Reply in Support of ("Def. Reply," ECF No. 132) Defendant's Motion.

///

The Court heard oral argument on March 7, 2019, and took the matter under submission. Having considered the parties' arguments, the evidence, and the law, the Court (1) **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion and (2) **GRANTS** Defendant's Motion as follows.

## BACKGROUND

Since 2005, Plaintiff American Fireglass has manufactured and sold pieces of broken tempered glass for use in fireplaces and fire pits. Declaration of Matt Doll ("Doll Decl.") ¶ 4, ECF No. 122-3. Defendant Moderustic is Plaintiff's competitor and has manufactured, sold, and distributed fireglass for use in aquariums, fireplaces, and firepits through its website since April 2003. Declaration of Edgar Jaunzemis ("Jaunzemis Decl.") ¶¶ 2–3, ECF No. 123-7.

## I. Defendant's Related Patent Applications

The long journey toward the issuance of the patent at issue began on April 14, 2003 when Defendant's founder, Mr. Edgar Jaunzemis, filed patent application number 10/413,620 seeking to patent a process related to tumbled or vibrated, polished, and broken tempered glass pieces. Pl. Ex. 28 at 1, ECF No. 83-29.[1] Defendant eventually abandoned that patent application. *See id.* On December 28, 2005, Defendant filed patent application 11/319,957 (the "'957 Application"). Pl. MSJ at 8 (citing Pl. Ex. 10 at 93–94, ECF No. 83-11). The U.S. Patent and Trademark Office ("PTO") considered two prior art references: U.S. Patent No. 6,409,500 B2 (the "Georgantas Patent") and U.S. Patent No. 5,486,135 (the "Arpaio Patent"). *Id.* at 8–9 (citing Pl. Ex. 9 at 1–3, ECF No. 83-10; Pl. Ex. 4 at 9, ECF No. 83-5).

///

---

[1] Both parties previously filed Motions for Summary Judgement. *See* ECF Nos. 83, 104. Following the Court's Claim Construction Order, ECF No. 111, the Court granted the parties' requests to amend their motions and vacated the previous motions. ECF No. 118. Both parties cite to the exhibits attached to their previous motions.

Pin citations to docketed materials refer to the CM/ECF numbers digitally stamped at the top of each page.

The PTO issued a final office action on March 26, 2008, rejecting all claims in the '957 Application because it would have "been obvious to one having ordinary skill in the art at the time the invention was made to modify the method of Georgantas with the tumbling and vibrating steps disclosed by Arpaio in order to polish glass fragments." *Id.* at 9 (quoting Pl. Ex. 11 at 6, ECF No. 83-12; Declaration of Charles Reidelbach ("Reidelbach Decl.") ¶ 6, ECF No. 122-2).

Mr. Jaunzemis appealed the PTO's decision to the Board of Patent Appeals and Interferences; the Board rejected most of Mr. Jaunzemis' claims as obvious in light of the prior art, but reopened prosecution on six claims. *Id.* (citing Pl. Ex. 12 at 8, ECF No. 83-13; Reidelbach Decl. ¶ 7). Mr. Jaunzemis repackaged his claims and, on July 12, 2011, the PTO issued U.S. Patent No. 7,976,360 (the "'360 Patent"). *Id.* (citing Pl. Ex. 14 at 1-18, ECF No. 83-15; Reidelbach Decl. ¶ 8).

After the '360 Patent issued, Plaintiff filed an *inter partes* review petition with the PTO. *Id.* at 10. The PTO re-examined the '360 Patent and rejected all of the '360 Patent claims as obvious in light of prior art. *Id.* (citing Pl. Ex. 6, ECF No. 83-7). Defendant appealed that ruling to the Patent Trial and Appeal Board, which affirmed, and then re-affirmed, the PTO's decision. *Id.* (citing Pl. Ex. 22 at 21, ECF No. 83-23; Pl. Ex. 29 at 10, ECF No. 83-30). Defendant appealed those rulings to the Federal Circuit, which affirmed the PTO's decision. *Id.* (citing Pl. Ex. 30 at 3, ECF No. 83-31; Reidelbach Decl. ¶ 9).

## II.    The '505 Patent

On July 11, 2011, while the '360 Patent was pending, Defendant filed another patent application as a continuation of the '957 Application. *Id.* (citing Reidelbach Decl. ¶ 10). The PTO granted Defendant's application, resulting in the issuance of the patent at issue, U.S. Patent No. 8,419,505 (the "'505 Patent") on April 16, 2013. *Id.* at 11 (citing Reidelbach Decl. ¶ 12).

During prosecution of the '505 Patent, Plaintiff's counsel sent several letters to Defendant's attorney of record because Plaintiff believed Defendant had failed to disclose the prior rejection of the related '360 Patent. Reidelbach Decl. ¶ 12. Plaintiff's counsel

considered the failure to disclose the rejection to be inequitable conduct in violation of Defendant's duty of candor and good faith in dealing with the PTO. *Id.* (citing Pl. Ex. 19 at 1–3, ECF No. 83-20). After receiving these letters, and after the '505 Patent issued, Defendant filed a Request for Supplemental Examination. Pl. MSJ at 11 (citing Pl. Ex. 21, ECF No. 83-22). On reexamination, the PTO rejected all claims as obvious. *Id.* (citing Pl. Ex. 23 at 1, 4, ECF No. 83-24; Reidelbach Decl. ¶ 13).

Defendant then submitted an amendment to narrow the '505 Patent's claims. *Id.* at 12 (citing Pl. Ex. 24 at 6–7, ECF No. 83-25). After several exchanges between Defendant and the PTO Examiner, the PTO issued an *ex parte* reexamination certificate of the '505 Patent on November 26, 2014. *Id.* at 13 (citing Pl. Ex. 28 at 1–2, ECF No. 83-29; Reidelbach Decl. ¶ 16).

The final '505 Patent is described as follows:

> This invention is directed to the creation of smoothed, heat-treated glass fragments. The invention places heat-treated glass fragments (i.e., glass that has been previously heated so that it will not crack or shatter under later heat) into a tumbling or vibrating apparatus. These glass fragments are then tumbled or vibrated for a period of time so that the surfaces of the glass fragments are smoother than prior to tumbling. The glass fragments are thereafter removed from either apparatus, resulting in smoothed, heat-treated glass fragments that are suitable for direct handling without hand protection.

Claim Construction Order at 5–6, ECF No. 111.

## III. Defendant's Enforcement Threats

Following the issuance of the '505 Patent, Mr. Jaunzemis began contacting Plaintiff, Plaintiff's dealers, and other glass sellers regarding alleged infringement of the '505 Patent. Pl. MSJ at 16 (citing Doll Decl. ¶ 11). Defendant sent one such email on February 10, 2015, to The Magic of Fire, a company that purchases fireglass from Plaintiff. ECF No. 12-2. In that email, Mr. Jaunzemis stated that

> "Moderustic is proud to have been issued 2 U.S. Patent Numbers, 7,976,360 B2 (in reconsideration), and 8,419,505 C1. . . . These

patents and applications cover our method of creating tumbled tempered glass for use in fireplaces and fire pits. . . . Since [Moderustic was] the first to file (with the patent office) we do hold the patent rights, and we may, if we so choose, [] enforce our intellectual property rights. . . . We need to see whether you are (allegedly) infringing as there may be legal repercussions."

*Id.* at 4–5. In October 2015, Defendant stated in a newspaper article, printed in The Sun Business, that Mr. Jaunzemis is "going after the companies he says are infringing on his patents" and that "he hopes to shut down competition and bring his annual sales up." ECF No. 12-4 at 2. Throughout the patent application process for both the '360 and '505 Patents, Defendant posted updates on its website about its patent rights, making various threats about potential enforcement. *See* Doll Decl. ¶ 16 (citing ECF No. 12-12 at 1–3).

## IV. Plaintiff's References to Tumbling on Its Website

In 2005, Plaintiff began selling tempered glass fragments for use in firepits. Doll Decl. ¶ 4. Although Plaintiff originally tumbled many of its products, by November 2014 it had completely "stopped tumbling the tempered glass fragments that it sold because tumbling slowed production and caused the glass fragments to become scratched and dull and less desirable." *Id.* ¶ 9. During this shift in its production methods and beginning on or about March 1, 2010, Plaintiff "began removing references to tumbling its fireglass from its advertising and promotional material, including its web site." *Id.* Plaintiff "mistakenly overlooked some products that appeared on its website" but "removed these remaining references to tumbling . . . immediately after it was brought to [Plaintiff's] attention in August 2016." *Id.*; *see also* Juanzemis Decl. ¶ 9–13.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense. Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect

the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

## ANALYSIS

### I.  Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment of Defendant's counterclaims. Pl. MSJ at 19, 27. Defendant's first counterclaim alleges that Plaintiff infringes the '505 Patent. *Id.*

15-CV-2866 JLS (BGS)

at 19; Answer to Compl. ¶¶ 12–25, ECF No. 22. The remaining counterclaims allege that Plaintiff's website contains false statements that constitute unfair competition and false advertising under federal and California laws. Pl. MSJ at 27; Answer ¶¶ 26–52.

Plaintiff argues that the Court should grant summary judge as to Defendant's first counterclaim on the grounds that the claims in the '505 Patent are (1) invalid because they cover only subject matter that would have been obvious at the time of invention to a person of ordinary skill in the art, Pl. MSJ at 19-26; and (2) Plaintiff does not infringe the '505 Patent because Plaintiff ceased tumbling its fireglass products before the patent was issued. *Id.* at 26–27.

### A. Obviousness

"A patent is presumed to be valid, and this presumption only can be overcome by clear and convincing evidence to the contrary." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1354 (Fed. Cir. 2010) (en banc) (quoting *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1281 (Fed. Cir. 2005)); *see* 35 U.S.C. § 282. A patent is invalid due to obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

"Generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *In re Cyclobenzaprine Hyrdochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) (internal quotation marks omitted). "Thus, the inquiry on summary judgment is whether a jury applying the clear and convincing evidence standard could reasonably find, based on the evidence produced by the accused infringer, that the claimed invention was obvious." *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. ///

7

Supp. 2d 1025, 1060 (C.D. Cal. 2011) (citing *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339–1340 (Fed. Cir. 2010)).

"Obviousness is a question of law based on underlying findings of fact." *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). When determining whether a patent is invalid for obviousness, the district court must first make the following four underlying factual determinations: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) whether any relevant secondary considerations rebut obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Secondary considerations are only relevant if there is a nexus between the secondary considerations and the claimed invention. *Ormco Corp. v. Align Tech. Inc.,* 463 F.3d 1299, 1311–1312 (Fed. Cir. 2006). Once a court makes these four underlying factual determinations, "the obviousness or nonobviousness of the subject matter is determined." *Graham*, 318 U.S. at 18.

### 1. Scope and Content of the Prior Art

The relevant prior art for an obviousness inquiry is analogous prior art. *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992). A prior art reference is analogous if it is: (1) in the same field of endeavor, regardless of the problem addressed; or (2) reasonably pertinent to the particular problem addressed by the claimed invention. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1321 (Fed. Cir. 2011). "A reference is reasonably pertinent if . . . it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his [or her] problem." *Id.* (alteration in original) (quoting *Clay*, 966 F.2d at 659). Whether a prior art reference is "analogous" is a question of fact. *Id.* (citing *Clay*, 966 F.2d at 658).

Plaintiff argues that the Arpaio and Georgantas Patents are prior art because the PTO, as well as the Board of Patent Appeals and Interferences, relied on these patents when they rejected the previous and related patent applications submitted by Defendant. *See* Pl. MSJ 22–24. Additionally, in its invalidity contentions, Plaintiff asserts that several prior art references that the PTO did not cite in its review are relevant prior art. *See id.* at

24–25.  These include: *How to Tumble Polish Gemstones and Make Tumbled Gem Jewelry* by Jarome Wexler ("Wexler"), Pl. Ex. 3, ECF No. 83-4; a patent issued by the World Intellectual Property Organization to Garry McBride (WO0222519A1) (the "McBride Patent"), Pl. Ex. 8, ECF No. 83-9; Glass Association of North America Glazing Manual, Glass Association of North America published 1997 (the "GANA Glazing Manual") Pl. Ex. 6, ECF No. 83-7; and *Standard Specification for Heat-Treated Flat Glass—Kind HS, Kind FT Coated and Uncoated Glass*, ASTM International, published February 1998 (the "ASTM Standard") Pl. Ex. 7, ECF No. 83-8.

Plaintiff also argues that a reference not included in its invalidity contentions is analogous prior art that supports the '505 Patent being invalid as obvious.  This prior art is a newsletter issued by the Clean Washington Center in November 1996 (the "Clean Washington Newsletter").  Pl. Ex. 5, ECF No. 83-6.

The Court finds that the relevant prior art includes the Georgantas and Arpaio Patents.  The Georgantas Patent "disclos[es] a process for producing an attractive fire from a gas line embedded in a bed of broken, tempered glass pieces, which may be 'abraded or polished so as to smooth over any sharp or pointed edges.'"  Pl. MSJ at 8 (citing ECF No. 98-2, at 7); *see also* Pl. Ex. 9.  The Arpaio Patent relates to "a vibratory tumbling machine vessel for burnishing or cleansing metal, plastic or ceramic elements." *Id.* at 9 (citing Pl. Ex. 4).  These patents are pertinent to the problem addressed, Defendant cited them as references while prosecuting the '505 Patent before the PTO, and Defendant does not dispute they are relevant prior art references.

Similarly, the Court finds that the ASTM Standard and the GANA Glazing Manual are relevant prior art.  Both prior art references describe processes for heating and cooling glass and the relevant specifications for such glass.  These are both within the field of endeavor and reasonably pertinent to the problem addressed by the '505 Patent.  Moreover, Defendant does not dispute they are relevant prior art. *See generally* Def. Opp'n.

Defendant does, however, dispute the remaining prior art references.  Beginning with Wexler, Defendant argues that "obviousness cannot be established by combining the

teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the *combination*." *Id.* at 31 (quoting *In re Geiger*, 815 F.2d 686, 688 (Fed. Cir. 1987)) (emphasis in original). This argument misses the mark. Determining whether there is a suggestion to modify and combine the prior art is not pertinent to whether the art is analogous.

Wexler describes in detail the tumbling of gemstones and further describes glass as one of the products capable of being tumbled and polished. Pl. Ex. 3 at 4. Defendant concedes that Wexler shows that the practice of tumbling has occurred for many years to smooth the edges of glass fragments. Def. Opp'n at 30. Because Wexler teaches smoothing the edges of glass fragments, it would have "commended itself to an inventor's attention in considering" how to create safe-to-handle tempered glass fragments. *See Innovention Toys*, 637 F.3d at 1321. The Court therefore finds Wexler to be relevant prior art.

Next, Defendant argues that the McBride Patent is not relevant prior art because it is not in the field of the inventor's endeavor and not reasonably pertinent to the problem the inventor solved. *Id.* at 31 (citing *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567 (Fed. Cir. 1984)). The '505 Patent describes its field of invention as "recycling broken, normal tempered glass waste into smooth glass pieces useful in, for example, lapidary construction, art, and functional interior and exterior decorating." Pl. Ex. 20 at 1:64–67, ECF No. 83-21. The McBride Patent's field of endeavor is the manufacture of decorative concrete products using a process whereby an "exposed aggregate" is embedded in the concrete. Pl. Ex. 8 at 1. The aggregate is decorative in nature and "consisting at least in part of fragmented glass." *Id.* at 3. The McBride Patent also discloses that it may be desirable to remove sharp edges by tumbling the glass in a rotating drum. *Id.* at 3–4. Although both the '505 and McBride Patents pertain, in part, to decorative materials, the Court concludes that the McBride Patent is not in same field of endeavor. Whereas the '505 Patent solely pertains to tempered glass, the McBride Patent primarily concerns decorative concrete fabrication.

The McBride Patent, however, does relate to a similar problem addressed by the '505 Patent. The McBride Patent specifically contemplates tumbling recycled glass to remove sharp edges before use as a decorative aggregate in a concrete molding. *Id.* This addresses an issue similar to that the '505 Patent addresses and logically relates to the inventor's concern, namely, removing sharp edges from decorative glass pieces. This is in accord with the January 16, 2014 PTO re-examination of the '505 patent claims where the PTO considered the Arpaio and Georgantas Patents and found them to be reasonably pertinent to the problem addressed. *See* Ex. 23 at 4, ECF No. 83-24 ("Arpaio teaches a process for smoothing glass."); *see also* Ex. 9 at 1, ECF No. 83-10; Ex. 23 at 11 (Georgantas Patent reasonably pertinent to making smooth tempered glass). The Court therefore finds that the McBride Patent is relevant prior art.

Finally, Defendant argues that the Court should not consider the Clean Washington Newsletter as prior art. Def. Opp'n at 31. Plaintiff does not address the Clean Washington Newsletter in its Reply brief. *See generally* Pl. Reply. The newsletter describes in relevant part a process for "produc[ing] a more aesthetically appealing crushed glass" by using "[g]lass processors that have either multiple rows of hammers that beat the glass into cubical shapes or a centrifugal action that tumbles the broken glass on itself to produce an autogenous shape." Ex. 5 at 1, ECF No. 83-6. A problem the '505 Patent addresses is making the recycled glass more aesthetically pleasing and, thus, the Court finds the Clean Washington Newsletter is reasonably pertinent to the problem addressed.

Defendant argues that the Clean Washington Newsletter lacks credibility, lacks foundation, is hearsay, and would likely not be admissible at trial and, thus, is not appropriate for the Court to consider. Def. Opp'n at 31. Defendant fails to support these contentions with any authority or record evidence. *See id.* The Court, therefore, is not persuaded by any of Defendant's conclusory legal assertions and finds that these do not create a material factual dispute regarding whether the Clean Washington Newsletter is prior art.

///

Defendant also argues that, because Plaintiff did not disclose the Clean Washington Newsletter in its invalidity contentions, the Court should exclude it. *Id.* at 32. Failure to include an obviousness combination in the invalidity contentions, as required by patent local rules, is reason to exclude a reference from consideration as prior art. *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1099 (N.D. Cal. 2011). Plaintiff did not reference the Clean Washington Newsletter in any of its obviousness combinations in its invalidity contentions. *See generally* Pl.'s Claim Chart, ECF No. 83-1 at 31–38. "Given that [Plaintiff] w[as] aware of the prior art in the file history from the outset of this case, [its] failure to include this theory in [its] invalidity contentions precludes [it] from proceeding on [any] obviousness combination[s]" that include the Clean Washington Newsletter. *See id.*

A "citation to previously undisclosed references may be permissible," however, "where these references are used to *support* a theory of invalidity that has been disclosed in a party's invalidity contentions." *Id.* (emphasis in original). To the extent that Plaintiff uses the Clean Washington Newsletter to support only a theory of invalidity previously disclosed, the Court finds that the Clean Washington Newsletter is relevant prior art because it is reasonably pertinent to the problem addressed by the inventor.

### 2. *Differences Between the Prior Art and Claims at Issue*

Having determined the scope and content of the prior art, the Court must next compare the prior art against the claimed invention to determine the specific differences, if any, that exist. *See Graham*, 383 U.S. at 17–18.

Plaintiff posits that every asserted claim in the '505 patent is found in the prior art. Pl. MSJ 23–25. In its invalidity chart, Plaintiff identifies where each limitation is disclosed in the prior art. Pl.'s Claim Chart at 31–38. Defendant argues the prior art does not disclose all, or portions of, claims 1, 2, 3, 7, 8, and 9. Def.'s Claim Chart, Def. Ex. B, ECF No. 128-3. Defendant concedes that claims 4, 5, 6, 10, 11, 12, 13, and 14 are disclosed in the prior art and that no differences exists; therefore, the Court will not address those claims. *See id.*

### a. Claims 1 and 7

The first dispute is whether the following limitations in claims 1 and 7 differs from what is disclosed in the prior art:

> "wherein each heat-treated glass fragment is formed from standard tempered glass fragments from standard fully tempered glass that has a surface compression of at least 3,500 pounds-force per square inch (PSI)."

Pl. Ex. 20 at 9:63–10:2, 10:33–37.

Plaintiff argues that the Georgantas Patent teaches forming tempered glass fragments from tempered glass. ECF No. 83-1 at 31 (citing Pl. Ex. 9 at 1:30–33, 2:38–41). Plaintiff next argues that the ASTM Standard discloses heat-strengthened glass having a surface compression between 3500 and 7500 PSI. *Id.* at 32 (citing Pl. Ex. 7 at 4). Finally, Plaintiff points to the GANA Glazing Manual as disclosing that heat-strengthened glass with a surface compression levels in the range of 3500 to 7500 PSI is most desirable for most uses. *Id.* (citing Pl. Ex. 6 at 4). Defendant, on the other hand, argues that "absolutely no reference discloses this element." Def. Claim Chart at 1 (emphasis omitted).

The Court construed "heat-treated glass" to mean "any glass that is processed to create a surface compression such that the fraction pattern of the glass results in many small glass fragments." Claim Construction Order at 8, ECF No. 111. "Heat-treated glass shall refer to, for example, fully tempered glass, heat-strengthened glass (also known as toughened glass), or any other glass heat processed to create a similar fracture pattern." *Id.* The Court also construed "standard fully tempered glass" to mean "(i) having a surface compression of at least 3,500 PSI; (ii) being formed by cooling the heated glass so as to leave a center area of the heated glass hotter than surfaces; (iii) being formed by heating the glass only once to a temperature of at least 1000° Fahrenheit and rapidly cooling it to a temperature below 700° Fahrenheit." *Id.* at 21–22.

For the type of glass used, the Georgantas Patent teaches using tempered glass that is baked three times in a controlled temperature and oxygen environment over a predetermined period of time and then broken to form smooth-edged pieces. Pl. Ex. 9 at

2:35–38. The '505 Patent, on the other hand, teaches using standard tempered glass which is not baked three times. Pl. Ex. 20. The Court finds that the '505 and Georgantas Patents do differ in the type of glass used. The Georgantas Patent concerns specially formulated tempered glass created by baking the glass three times, while the '505 patent does not. Defendant has not, however, shown that this difference is material. Nothing indicates that this difference changes the process for creating the finished products in any way or would cause a person of ordinary skill in the art to not consider these Patents to address the same problem in the same field of endeavor.

Concerning the heating and cooling process, the Georgantas Patent teaches rapid cooling of the outer surfaces, while the center is allowed to cool slowly. Pl. Ex. 9 at 3:63–4:1. Specifically, it discloses that the heating process is "followed by rapid cooling of the outer surfaces via controlled air blasts or an oil-water cooling process, while the center is allowed to cool slowly." *Id.* Plaintiff argues that this method is not actually different form the one described in the '505 Patent. Plaintiff states that "[t]he use of air to cool heated glass has been known and previously described," ECF No. 83-1 at 35, and that "[i]t is inherent that the center of the glass would be hotter than the surfaces that are cooled." *Id.* While Plaintiff provides no citation for this statement, the Court agrees. The Georgantas Patent references U.S Patent No. 5,656,558 (the "'558 Patent"), which discloses a method for creating fire retardant safety glass. The '558 Patent states:

> The high coefficient of thermal expansion of these glasses means that such glass panes possess, even at a high compressive stress of 120 N/mm$^2$—irrespective of pane thickness—a temperature difference resistance (TUF), between the *cold edge of the pane and the hot center* of only about 200 to 220 K. The temperature difference resistance characterizes the property of a pane to *withstand the difference in temperature between the hot center of the pane and the cold edge*.

'558 Patent, at 1:59–67 (emphasis added). This is exemplary of a hotter center of glass and cooler edge of glass.

///

As for the temperature and PSI used, the Georgantas Patent teaches that "glass is preferably from 2.5mm to 20mm in thickness, and is baked at least three times at temperatures of about 1200° F for 30 minutes or more." Pl. Ex. 9, at 2:35–38. The GANA Glazing Manual teaches heat-treating glass by uniformly heating the glass to approximately 1150° Fahrenheit. Pl. Ex. 6 at 8. It also discloses an ideal surface-compression level of 3,500 to 7,500 PSI. *Id.* at 9. The ASTM Standard specification for heat-treated glass reveals that heat-strengthened glass with a thickness of 1/4" (6mm) and less will have a surface compression of 3,500 to 7,500 PSI. Pl. Ex. 6, at 4. Each reference discloses a surface compression of at least 3,500 PSI and a temperature that is over 1000° Fahrenheit. The Court therefore finds that there are no material differences between these specifications and those found in the '505 patent.

Next, Defendant argues that no prior art discloses the phrase "substantially rounded, bead-like shape" in both claims 1 and 7. Def. Ex. B, at 1, 3, ECF No. 128-3. Plaintiff contends that Wexler; the Arpaio, Georgantas, and McBride Patents; and the Clean Washington Newsletter all disclose this term. Pl. MSJ at 33; Pl. Claim Chart at 18–19, 21–22.

The Court construed the phrase "substantially rounded, bead-like shape" as two separate terms. The Court defined "substantially rounded" as "smoothed in such a way that the glass fragments are free of sharp burs and suitable for direct handling." Claim Construction Order at 22–25. The Court defined "bead-like shape" according to the parties' stipulated construction as "having varying shapes and sizes." *Id.*

The Georgantas Patent teaches that "[t]he formed pieces of the broken, tempered glass may be washed and sifted to remove any debris, and may be further abraded or polished to form glass pieces without sharp edges, if needed." Pl. Ex. 9 at 2:38–41. It goes on to disclose that, "[t]o insure that no sharp edges or slivers remain, the broken pieces of tempered glass may be washed and then sifted to remove debris." *Id.* at 4:16–20. In this manner, a bed of glass is formed from smooth pieces, which pieces are approximately the same size." *Id.* Finally, the Georgantas Patent specification provides that "[w]hen the

glass is properly and tightly packed around a gas pipe, for example, in a wedge, mounded flat, or a beveled manner, the *rounded pieces* of the bed of glass will produce . . . myriad . . . sparkles from the flames burning near and over the top of the bed." *Id.* at 4:23–27 (emphasis added).

The Arpaio Patent teaches a solution for the "need for a unit and/or combination unit for treatment(s) of diverse sizes and types of microsized lots of elements, in the burnishing and/or polishing thereof—also including one or more of *deburring*, polishing and/or other surface preparation of one or more of metal, plastic and/or ceramic (such as glass, etc.) elements." Pl. Ex. 4 at 7:33–38 (emphasis added); *see also id.* at 8:16–22.

Wexler teaches how to tumble various materials, including glass. Wexler at 4. It teaching that, in the tumbling process, "[t]he purpose of the first grind is to remove all the rough surfaces, crevices, blemishes, etc. When the grind is completed you should have *rounded stones of about the desired size*." *Id.* at 9 (emphasis added). Wexler also states that a vibrating tumbler is acceptable for use in lieu of a rotating tumbler. *Id.* at 12.

Finally, the McBride Patent discloses tumbling glass for use in concrete molding. Specifically, it teaches that, "[b]ecause the glass fragments are exposed at the surface of the finished cast concrete product, . . . it may be desirable or necessary for safety reasons for sharp edges of the glass fragments to be removed prior to use." Pl. Ex. 8 at 2:27–30. The McBride Patent teaches that the sharp edges "may be achieved by tumbling of the glass, [e.g.] in a rotating drum, to give the fragments a *rounder form* with fewer or no sharp edges or points." *Id.* at 2:30–3:2 (emphasis added).

As noted, the Court defined "substantially rounded" to mean "smoothed in such a way that the glass fragments are free of sharp burs and suitable for direct handling" and "bead-like shape" to mean "having varying shapes and sizes." *See* Claim Construction Order at 22. The Court finds that the Georgantas Patent teaches removing sharp edges; the Arpaio Patent specifies that its tumbling process removes burrs from glass; Wexler teaches removing sharp edges, crevices, and blemishes, and the McBride Patent discloses tumbling glass for safety reasons to remove sharp edges. Further Wexler and the Georgantas and

16

McBride Patents all discuss rounded elements. In sum, the prior art teaches smoothing glass to remove burs and create a rounded shape, leaving the glass suitable for direct handling. Therefore, the Court finds no material differences exist between the '505 Patent and the prior art regarding this limitation.

Based on these findings, the Court determines that there are no material differences between the prior art and claims 1 and 7.

b.     Claims 2 and 8

Next, Defendant argues that absolutely no reference discloses the elements in claims 2 and 8. Ex. B, at 1, 3. Claim 2 discloses "[a] method as recited in claim 1, wherein the plurality of heat-treated glass pieces [are] formed from tempered glass that has been heated to a temperature in the range of about 1,200° to 1,600° Fahrenheit and rapidly cooled to a temperature below 600° Fahrenheit." '505 Patent, at 10. Claim 8 discloses the same limitation but derives from independent claim 7. *Id.* Plaintiff does not address claims 2 or 8 in its chart.

As noted above, several prior art references, including the GANA Glazing Manual and the Georgantas Patent, disclose a process for heating and rapidly cooling the glass. Pl. Ex. 9, at 2:35–38; Pl. Ex. 6 at 8–9. The references do differ from the claims in that the references do not contain the exact temperatures and process for cooling that the '505 Patent claims contain. The Court finds these differences, however, are not material. This difference does not change the process in a meaningful way.

c.     Claims 3 and 9

Defendant contends that no reference discloses claims 3 and 9. Def. Ex. B, at 2–3. Claim 3 states "[a] method as recited in claim 1, wherein each glass fragment is formed from toughened glass that has a surface compression of at least 4,500 pounds-force per square inch (PSI)." Pl. Ex. 20 at 10. Claim 9 discloses the same limitation but derives from independent claim 7. *Id.* As discussed above, both the GANA Glazing Manual and the ASTM Standards disclose heat-treated glass with surface compression between 3,500 and 7,500 PSI. The 4,500 PSI found in claims 3 and 9 clearly falls within the range

disclosed by the prior art references. Thus, the Court finds no differences between claims 3 and 9 and the prior art.

### 3. *Level of Ordinary Skill in the Art*

In its Motion for Summary Judgment, Plaintiff does not take any position as to the relevant skill in the art or submit any evidence pertaining to the level of ordinary skill in the art. *See generally* Pl. MSJ. Defendant argues that Plaintiff's failure to produce evidence regarding the ordinary skill in the art creates a genuine issue of material fact. Def. Opp'n at 16 (citing *Robotic Visions Sys., Inc. v. View Eng'g, Inc.*, 999 F. Supp. 1325, 1336 (C.D. Cal. 1997)). Defendant seems to suggest that the appropriate level of skill in the art is that of a glazier. *See id.* at 19.

Plaintiff responds by arguing that the subject matter of Defendant's patent is easily understandable by the average person and, therefore, Plaintiff need not define the level of ordinary skill in the art. Reply at 10. In the alternative, Plaintiff points to the PTO's finding that a person of ordinary skill in the art is not sophisticated. *Id.* (citing Pl. Ex. 23 at 4, ECF No. 83-24; Pl. Ex. 29 at 10, ECF No. 83-30).

In select circumstances, it is not required for a court to make a specific finding of a particular level of skill in the prior art, though this is usually the case when the prior art itself reflects the appropriate level. *See Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 779 n.2 (Fed. Cir. 1983). "[I]f the differences between the patent in suit and the prior art are such that the subject matter as a whole is obvious to a lay(person), a determination of the level of skill on the basis of expert testimony in the pertinent art would be useless." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 205 (7th Cir. 1982) (quoting *Med. Lab. Automation, Inc. v. Labcon, Inc.*, 670 F.2d 671 (7th Cir. 1981)).

Although the PTO was able to make findings of obviousness regarding Mr. Jaunzemis' prior patent applications without making an explicit determination of the level of ordinary skill in the art, "it is always preferable for the factfinder below to specify the level of skill it has found to apply to the invention at issue." *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). For this reason, the Court will make a determination of

the level of ordinary skill in the art of fireglass. *See Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1214–15 (C.D. Cal. 2011).

In making this determination, factors that the Court may consider include the type of problems encountered in art, the prior art solutions to those problems, the rapidity with which innovations are made, sophistication of the technology, and the educational level of active workers in the field. *Id.* (quoting *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000)). Not all such factors may be present in every case, and one or more of them may predominate. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 963 (Fed. Cir. 1986).

Upon review of the factors, the Court finds that the Patent at issue and prior art include no advanced technology that require more than a basic knowledge of glass and tumbling. All of the prior art is easily understandable to an ordinary lay person of average intelligence and, thus, no advanced degree is necessary. And the technology and the process described in the '505 Patent for transforming recycled tempered glass into the finished fireglass that is safe to handle is easily understandable as well.

Based on these findings, "the Court assumes without deciding that the level of ordinary skill in the art of [fireglass] is that of an ordinary layman of average intelligence who is aware of the prior art." *See Link Treasure Ltd.*, 809 F. Supp. 2d at 1215. Although Defendant seems to indicate that the ordinary skill is that of a glazier, the Court notes that its more general "finding of skill is the most favorable for [Defendant], as a less sophisticated person of ordinary skill is generally more favorable to a patent owner." *Id.* (citing *Union Carbide Corp.,* 724 F.2d at 1573).

### 4. Secondary Considerations

Objective evidence of nonobviousness, often referred to as "secondary considerations" or the "objective indicia of nonobviousness," may rebut a prima facie showing of obviousness. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) (citing *Graham*, 383 U.S. at 17–18). These considerations include commercial success, long-felt but unsolved needs, failure of others to achieve the invention, and

copying by others. *Id.* To rebut a showing of obviousness, there must be a "nexus" between the invention claimed in the patent and the commercial success or other secondary consideration. *Id.* at 1311–12.

Defendant argues that two secondary considerations are relevant here and rebut any showing that the '505 Patent is obvious. Def. Opp'n at 13. First, Defendant argues that commercial success is indicative of nonobviousness. *Id.* According to Defendant, "[p]rior to [] Jaunzemis' invention, originally applied for in 2003, there was no fireglass market." *Id.* Since then, the market for fireglass has increased exponentially. *Id.* As evidence of commercial success, Defendants point to public import data that purportedly shows a surge in sales following its Patent application. *Id.* at 13–14 (citing Declaration of Nickie Bonenfant (Import Genius), ECF No. 128-8).

The Court has serious misgivings about whether this information actually shows commercial success.[2] But even if it did, what is not clear from this data is whether "there is a nexus between the claimed invention and the commercial success." *See Ormco Corp.*, 463 F.3d at 1311–1312. "[If] the commercial success is due to an unclaimed feature of the device" or if "the feature that creates the commercial success was known in the prior art, the [commercial] success is not pertinent." *Id.* at 1312. Here, Defendant fails to show that the proffered data proves commercial success for products that "embod[y] the claimed features" of the '505 Patent. *See Brown & Williamson Tobacco Corp. v. Phillip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). More importantly, based on the Court's previous finding that there are no material differences between the '505 patent and the prior art, *see supra* Section I.A.2, Defendant cannot show that its claimed commercial success

_____

[2] Although the Court makes its determination without using this data, the Court notes its reservations about the appropriate weight to give the Import Genius data. The first pages of data clearly show imports from Plaintiff in particular beginning in 2017, but do not include total figures for each year or specific data that show the products in question actually incorporate the Patent claims at issue. Moreover, Plaintiff has expressly claimed that it discontinued tumbling its products by November 2014, making this data irrelevant to the question at hand. The remaining data purportedly show the overall market, but fail to include the weight of the product, what the product actually is, to whom the product was sold, and—most importantly—on which dates the products were shipped.

occurred for reasons not known in the prior art. Thus, Defendant's argument of "the commercial success is irrelevant." *Ormco Corp.*, 463 F.3d at 1311–1312 (citing *Brown & Williamson*, 229 F.3d at 1130 (finding commercial success attributed to feature not present in the invention); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed.Cir.1983) (finding commercial success not pertinent when patentee failed to show that "such commercial success as its marketed system enjoyed was due to anything disclosed in the patent in suit which was not readily available in the prior art")).

Next, Defendant argues that Plaintiff copied the claimed invention which is indicative that the '505 Patent is nonobvious. The Court is not convinced, however, that the record supports Defendant's assertions that Plaintiff copied Defendant's products. And even if Plaintiff did copy Defendant's invention, "more than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (quoting *Cable Elec. Prods. v. Genmark, Inc.*, 770 F.2d 1015, 1028 (Fed Cir. 1985)). Defendant failed to show any facts—such as failed attempts to create the invention prior to the copying—to indicate that the alleged copying was because the invention was not obvious, rather than, for example, "a general lack of concern for the patent property." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000) (quoting *Cable Elec. Prods.*, 770 F.2d at 1028). This secondary consideration, therefore, does not support Defendant's contention that the '505 Patent is nonobvious.

### 5. Obviousness Determination

After considering the *Graham* factors and making the requisite factual determinations, the Court concludes that it would have been obvious to a person of ordinary skill in the art to combine the relevant prior art, including Wexler, and the Arpaio, Georgantas, and McBride Patents, to create the claimed invention.

To begin, the Court first notes that "[c]laims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot

be sustained to cover that which was previously by limitation eliminated from the patent." *Graham*, 383 U.S. at 33 (citing *Powers-Kennedy Contracting Corp.*, 282 U.S. at 185–86; *Schriber-Schroth Co.*, 311 U.S. at 220–21). Plaintiff argues that "[i]ssues raised and previously decided in the ['360 Patent] are binding on the scope and interpretation of the '505 [P]atent." Pl. Reply at 11 (citing *Jonsson v. Stanley Works*, 903 F.2d 812, 817 (Fed. Cir. 1990); and *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004)). The Board of Patent Appeal and Interferences, the Patent Trial and Appeal Board, and the Federal Circuit all held that the '360 Patent was obvious over the prior art. Pl. MSJ 22–24. The '505 Patent issued only by proposing a limitation as to the shape of the glass ("substantially rounded, bead-like shape"). *Id.*; *see also* Def. Opp'n at 26–28 ("[T]he amendment to add the limitation of the glass fragment having 'a substantially rounded, bead-like shape' overc[a]me[] the rejections on the record."). Based on this history of the '505 Patent and other related patents, the Court agrees with Plaintiff that the '360 Patent and the '505 Patent are virtually identical—save the term "substantially rounded, bead-like shape." *See id.* at 24. Indeed, even the inventor Jaunzemis acknowledges that the only difference between the '360 and the '505 Patent is the shape of the glass. Pl. Ex. 32, at 20, ECF No. 83-33.

Despite this history, Plaintiff's burden is more than just proving that a "substantially rounded, bead-like shape" is obvious over the prior art because all other elements were obvious in the '360 Patent. Put differently, even if A + B is obvious and C is obvious, it does not automatically follow, at least as a matter of law, that A + B + C is also obvious. *See Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 954 (S.D. Iowa 2010) (citing *TorPharm, Inc. v. Ranbaxy Pharmaceuticals, Inc.*, 336 F.3d 1322 (Fed. Cir. 2003)). Instead, "[i]n evaluating a claim's validity, the 'determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim.'" *Id.* at 954–55 (emphasis omitted) (quoting *Sanofi–Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008) (citing 35 U.S.C. § 103).

///

Defendant argues that, despite aspects being found in the prior art, the '505 Patent is not obvious when—as it must—it is considered as a whole. Def. Opp'n at 11 (citing 35 U.S.C. § 103). According to Defendant, nothing in the prior art suggests a person of ordinary skill in the art at the time the Patent issued would have combined the elements. Def. Opp'n at 19–20. Specifically, it would not have been obvious to take the process for using standard tempered glass; tumble those glass fragments into a safe-to-handle, bead-like shape; and use them in a decorative fashion. *Id.*

The Court agrees that "the critical question is whether the invention as a whole was taught or suggested by the prior art, not merely whether individual elements or features of the invention are found somewhere in the prior art." *Id.* But viewing the Patent in this light does not change the Court's determination that the '505 Patent as a whole is obvious.

The Court concludes that, at the time the '505 Patent issued, it would have been obvious to a person of ordinary skill in the art to combine the teachings of the prior art into the process described in the '505 Patent. The Court finds that the process for creating the standard tempered glass, breaking that glass, and using it in a decorative fashion described in the '505 Patent is virtually identical to that found in the '360 Patent. The Court agrees with the PTO's numerous findings that this process is obvious to a person of ordinary skill in the art. The Georgantas Patent teaches a very similar process for using heat-treated glass, breaking that glass, and using it for decorative purposes—including for use in fire pits. Although the Georgantas Patent teaches using specially formulated tempered glass (created by baking it three times), the Court finds that it would be obvious to a person of ordinary skill to take the teachings as they pertain to this specially formulated glass and to apply them to standard tempered glass.

With this process as a baseline, the Court concludes that it would have been obvious to a person of ordinary skill in the art to tumble the glass pieces to form a substantially rounded, bead-like shape that is safe to handle. The prior art, including the Arpaio Patent and Wexler, clearly teaches the process of tumbling various materials—including glass—to remove sharp edges. Faced with the problem of how to remove sharp edges on the

broken tempered glass pieces, an obvious solution for a person of ordinary skill in the art would be to tumble or vibrate those pieces using the processes described in the prior art. Moreover, the obvious shape of those pieces would be rounded pieces of various shapes and sizes. While Defendant vehemently denies this would be obvious, Defendant's only evidence in support of the nonobviousness of the '505 Patent is Mr. Jaunzemis' declaration. *See generally* Jaunzemis Decl. But subjective evidence of obviousness from the point of view of the inventor is not evidence of nonobviousness sufficient to create a genuine dispute of material fact. *See, e.g., Ryko*, 950 F.2d at 718; *Celanese Corp. v. BP Chem. Ltd.*, 846 F.Supp. 542, 547 (S.D. Tex. 1994) ("[E]vidence of the patent's 'subjective obviousness' to the inventor . . . is direct evidence of nothing.").

"Finally, the Court relies upon '[c]ommon sense [which] has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning.'" *Link Treasure Ltd.*, 809 F. Supp. 2d at 1218 (quoting *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009)). The process for creating tempered glass, breaking that glass, and using it for decorative purposes was a known invention at the time of the '505 Patent. The addition of the shape of the glass and making it safe to handle is a "single, simple, element disclosed in prior patents." *Id.* To an ordinary person in the art, familiar with the prior art described here, tumbling or vibrating the glass to create a substantially rounded, bead-like shape so the edges are smooth and safe to the touch would have been obvious. *See id.* (citing *KSR Int'l*, 550 U.S. at 420 ("Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle.")).

After a review of the *Graham* factors, the Court finds that Plaintiff has shown, by clear and convincing evidence in the form of prior art, that the '505 Patent is obvious. Combining the elements found in the prior art would have been obvious to a person of ordinary skill in the art at the time the Patent issued. Accordingly, the '505 Patent is invalid as obvious under section 103(a).

### B. Whether Plaintiff Infringes the '505 Patent

Plaintiff also moves for summary judgment for non-infringement against Defendant's '505 Patent. Pl. MSJ at 28. Because the Court finds the '505 Patent is invalid, Plaintiff's motion for summary judgment of non-infringment of the '505 patent is **DENIED AS MOOT**.

### C. Defendant's Remaining Counter Claims

Defendant's remaining counter claims are brought under the Lanham Act and California Unfair Competition Law on the grounds that Plaintiff's statements on its website that several products are tumbled are false and constitute false advertising. Ans. 22, ¶ 28.

#### 1. Lanham Act

In the Ninth Circuit, liability under section 43(a) of the Lanham Act is established by proving:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(1)(B)). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

Plaintiff does dispute that the claims on its website were literally false. Plaintiff contends that summary judgment is appropriate because the website references only applied to two products out of many and, thus, Defendant's damages are "de minimus."

Pl. MSJ at 27. Moreover, according to Plaintiff, Defendant failed to show that this fact would have impacted any consumer's decision to purchase the product. *Id.* at 27–28.

///

In searching the case law, the Court is unable to find any authority that absolves a defendant for making literally false statements on the account that they cause only de minimus harm. In addition to the lack of authority, this argument fails because "an inability to show actual damages does not alone preclude [] recovery" under the Lanham Act. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1411 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016). Importantly, Plaintiff has failed to bring forth any evidence that supports its contention that Defendant suffered no harm and, therefore, Plaintiff has failed to meet its burden to show the absence of a genuine issue of material fact.

Accordingly, the Court **DENIES** summary judgment as to Defendant's counter claims under the Lanham Act.

### 2. *California Unfair Competition Law*

Defendant also brings claims under California Business and Professions Code sections 17200, et seq., the California Unfair Competition Law ("UCL"). Liability under this section and the Lanham Act are "substantially congruent." *Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010). Thus, a finding that Defendant's Lanham Act fails "on the merits" is conclusive that its state law claims fail as well. *Id.* Because the Lanham Act and the UCL are substantially similar, the Court finds that the same reasoning applies for those claims and therefore **DENIES** summary judgment as to Defendant's claims under the UCL.

## II. Defendant's Motion for Summary Judgment

Defendant seeks summary judgment as to all of Plaintiff's claims under the Lanham Act and the UCL on the grounds that Plaintiff fails to show that any statements made by Defendant were false, there is no evidence of injury, and there is no evidence of bad faith. Def. MSJ at 6–7.

### A. Lanham Act

In cases involving alleged false assertions of patent rights, the law of the regional circuit in which the district court sits governs claims of unfair competition. *See, e.g., Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.,* 75 F.3d 1568, 1574 (Fed. Cir. 1996). Thus, the Ninth Circuit's standard for proving Lanham Act claims applies here. In addition to the five elements normally required to prove a Lanham Act violation, in the Ninth Circuit, "where Lanham Act claims . . . are based on a defendant's representation that someone infringed his patent, plaintiff must show that defendant's representation was made in bad faith." *Appliance Recycling Centers of Am.*, 378 F. App'x at 654 (quoting *Fisher Tool Co. v. Gillet Outillage,* 530 F.3d 1063, 1068 (9th Cir. 2008)).

Plaintiff bases its false advertising claims on letters sent by Mr. Jaunzemis to it and its dealers. The letters threaten to sue for infringement of the '360 and '505 Patents, stating in relevant part that "Moderustic is proud to have been issued 2 U.S. Patent Numbers, 7,976,360 (in reconsideration) and 8,419,505 . . . . These patents and applications cover our method of creating tumbled tempered glass for use in fireplaces and fire pits." ECF Nos. 12-2, 12-3. Plaintiff contends that these threats constitute false statements that caused its distributors to no longer buy from it, causing Plaintiff harm.

The Court does not find that these statements were literally false. At the time Defendant sent these letters in 2015, the PTO had issued the '505 Patent to Defendant. *See* Pl. Opp'n at 5–6. And although the PTO had rejected the '360 Patent, it was technically being reconsidered by the Federal Circuit at that time the letters were sent. *Id.* Thus, these statements are not literally false.

"An advertisement that is not literally false may support a Lanham Act claim only if it is shown 'that the advertisement has misled, confused, or deceived the consuming public.'" *Appliance Recycling Ctrs. of Am.*, 378 Fed. App'x at 655 (quoting *Southland Sod*, 108 F.3d at 1140). The Court finds that no reasonable jury could find these statements to mislead, confuse, or deceive the consuming public when considered in their overall context. The letter clearly indicates that the '360 Patent is in reconsideration. More

importantly, the '505 Patent had been issued at the time the letters were sent, giving Defendant the right to enforce its legal rights as the Patent holder, regardless of the '360 Patent's status. Thus, even if the letter misled the recipient into believing that Defendant had an enforceable right as to the '360 Patent, that right was duplicative of Defendant's right to enforce the '505 Patent.

The Court also finds that "Plaintiff[ has not] presented any evidence that defendant[] drafted or forwarded the letters in bad faith." *Fisher Tool Co.*, 530 F.3d at 1068. The letters clearly indicate that the '360 Patent was "in reconsideration" and, although Plaintiff vehemently disagrees with the PTO's issuance of the '505 Patent, Defendant did in fact have the right to enforce its rights as the patentholder at that time. Without a showing that Defendant had some malicious intent, rather than simply asserting its rights as the patentholder, the Court cannot find bad faith present here. *See id*. at 1068–1069 (refusing to infer bad faith where the plaintiffs failed to bring forth any evidence other than the alleged misrepresentation).

Accordingly, the Court **GRANTS** summary judgment in favor of Defendant with regard to Plaintiff's Lanham Act claims.

### B.    *California Unfair Competition Law*

In addition to the Lanham Act claims, Plaintiff also brings claims under the UCL. Because the Court has found the letters insufficient to support Plaintiff's Lanham Act claims, *see supra* Section II.A., those same letters cannot support Plaintiff's claims under California law. *Cf. Appliance Recycling Ctrs. of Am.*, 378 Fed. App'x at 655. Accordingly, the Court **GRANTS** summary judgment in favor of Defendant with regard to Plaintiff's claims under the UCL.

### CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment. Specifically, the Court **GRANTS** Plaintiff's Motion as it relates to Defendant's infringement claims and **DENIES** Plaintiff's Motion as ///

it relates to Defendant's claims under the Lanham Act and the UCL. The Court **GRANTS** Defendant's Motion for Summary Judgment in its entirety.

      **IT IS SO ORDERED.**

Dated: March 15, 2019

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

15-CV-2866 JLS (BGS)